In the Matter of the Abrogation of the Adoption of Francis Souers, an Infant.

Surrogate's Court, Westchester County, January 9, 1930.

*O'Grady & Moynahan* [*Bartholomew A. Moynahan* of counsel], for the petitioners, foster parents.

*O'Grady & Moynahan*, for State Charities Aid Association, Inc.

*Arthur I. Strang*, special guardian.

SLATER, S. Application for the abrogation of an adoption is rare. When an adoption contract is entered into, the adult takes the minor into the relation of child, and thereby acquires the rights and incurs the responsibilities of a parent in respect to such minor.

Adoption in a strict sense is the transfer of a person from the authority of his father, or grandfather, into the paternal authority of the adopting father, and the legal relation between adopting parents and adopting children is that of legal parent and child, including the powers of parental control, the duties of filial obedience, and the reciprocal property rights by inheritance.

The sources of the law of adoption may be found in Hammurabi and His Code, more than two thousand years B. C. Adoption was also known to the Athenians, the Spartans and the Romans.

It was a part of the French and Spanish law, but was not recognized by the common law of England. It exists in America solely by force of statutes. The first law on the subject of adoption in our State was the law of 1873, chapter 830. This enactment provided for the *voluntary* adoption of children upon consent of parents. The right of inheritance was conferred by chapter 703 of the Laws of 1887.

Our law of adoption provides for the rescission of the agreement. (Dom. Rel. Law, §§ 117, 118, as amd. by Laws of 1924, chap. 323.) The contract between the parties, made with the approval of the court, is entered into, subject to these methods of abrogation. The approval of the court is a ministerial act. In Pennsylvania it was held that, as the adoption statute contained no provision for a rescission of the contract of adoption, it could not be revoked at the instance of the foster parent, while the child was still a minor, for the child could not consent to a rescission of the contract, nor could any one else waive his rights for him. (*Matter of Thiel*, 14 Weekly N. C. [Penn.] 422.)

The law of adoption is a creation of the Legislature, and is prone to be more awkward and ungainly than the well-settled concepts of common law. The weight of authority treats an adoption on the same principle as legitimacy, and it is, therefore, a *status*, subject, however, to a rescission of the *status*.

In an application of this character, the court is charged with the duty of issuing a citation directed to the child, to the corporation which was a party to the adoption, and appointing a special guardian to protect the interests of the child and to contest such application on behalf of the child. In the instant case, the court appointed Arthur I. Strang as such special guardian. He accepted the duty and has made a comprehensive report on the facts and the law. His report is learned and useful.

Francis Souers was born in or about 1913, and by proceedings duly had was placed in the care and custody of the State Charities Aid Association of New York, Inc., a corporation empowered and duly authorized, under the laws of the State of New York, to place children in homes for adoption.

While the infant was of tender years, he was placed, it appears, with one or two families, either as a temporary home, or with the intention of his being adopted by the families, but, for reasons that do not appear, no adoption of said infant occurred.

In 1917 said infant, then being about four years of age, was placed with the petitioners with the idea of a subsequent adoption by them.

On or about January 30, 1920, he was adopted by the petitioner and his wife, pursuant to an order of adoption signed by one of

the surrogates of the county of New York. No question is raised in this proceeding of the legality and regularity of such adoption.

An examination of the Domestic Relations Law will disclose that there are three sections relating to the abrogation of an adoption. Section 116 (as amd. by Laws of 1920, chap. 287) provides for an abrogation by a proceeding in which the foster parent or parents, the person adopted and the persons whose consent would be necessary to an original adoption, must appear before the court and present such application. It may be generally characterized as a proceeding conducted upon the consent of all parties interested. Section 117 (as amd. by Laws of 1924, chap. 323) provides for such proceeding where the adoption was of a child from a *charitable institution* and the application for the abrogation is on the *part of the child,* or by some person or institution on behalf of the child, and provides generally for a case where the foster parents have conducted themselves in a manner that would be contrary to the best interests of the child. The instant application is of the third kind. Section 118 (as amd. by Laws of 1924, chap. 323) provides for an application on the part of the *foster parent* on account of the misconduct of the child.

The reason for these different applications for abrogation becomes apparent upon a careful study of the law of adoption.

By chapter 830 of the Laws of 1873 the Legislature laid down general rules for the adoption of minor children, which law, as amended by chapter 703 of the Laws of 1887 and by chapter 485 of the Laws of 1888, is the foundation of a greater part of article 7 of the Domestic Relations Law. It relates to voluntary adoption and not to the adoption of infants *in the custody of public or charitable institutions.*

Eleven years later, however, by chapter 438 of the Laws of 1884, the Legislature of the State of New York provided for the adoption of dependent children in the custody and care of orphan asylums and other charitable institutions. Section 12 of that law is the foundation of section 117 of the Domestic Relations Law, which gave the procedure for the abrogation of an adoption upon the application of the *child or of someone in his behalf.*

Section 13 of chapter 438 of the Laws of 1884 is the foundation of section 118, upon which this application is predicated.

These laws relating to adoption became a part of the Domestic Relations Law, chapter 48 of the General Laws of 1896. The only material difference between section 13 of the Laws of 1884 and section 68 of the Domestic Relations Law of 1896 was an extension of jurisdiction so that the county judge, as well as the surrogate, could entertain such a proceeding.

Section 68 of the Domestic Relations Law of 1896 became section 118 of the Domestic Relations Law of 1909, and continued without amendment until 1920 and 1924. The part of the section which authorizes the abrogation is practically the same.

The act of 1884 provided for the cancellation or abrogation of the adoption of dependent children " upon the ground of the willful desertion of such child from such foster parent, or of any misdemeanor, or ill-behavior of such child," and if the surrogate shall determine " that said child has violated his duty toward such foster parent," then the adoption may be canceled. The present section 118 uses almost the identical words.

The courts have always been eager to take a position, affecting an infant, that the primary consideration must be the welfare of the infant. Nevertheless, section 118 requires the court to give not only due consideration to the interests of the child, but " due regard to the *interests of both.*" In no other proceeding involving the custody of a child is the court directed by statute to take into consideration the interests of any person other than the child.

In this proceeding the petitioner was, as might be expected, the principal witness, and, by his testimony, gives in fair detail the story of his efforts to bring up this child. The learned special guardian has also considered the application in this proceeding as expressing more logically, perhaps, the efforts of the adopting parents. It is not a pleasant story to read, for it does appear from the first that the child had many faults. It is unnecessary to go into elaborate discussion of heredity and environment, nor does the court believe that there is much value in precedent.

The problem of the adopting parent was to ascertain if the environment would overcome heredity. The case is a problem of human genetics. There may be an " average child " in scientific reports and among persons who collect statistics about children, but that is only theoretical, and every child is a case unto himself. What may be medicine for one child is poison to another. While it is possible to bring up other people's children in the right and proper way, it is a most difficult task to bring up one's own children, and natural parents or foster parents of necessity educate themselves in educating a child. We may look back and see where we have made our errors, but it is unfair to condemn or criticize other people if they have made honest and sincere efforts to do their duty.

An examination of the testimony and consideration of letters from those who had charge of the education of the child, show, in the judgment of the court, that an honest and sincere effort was made to bring up such child in a proper manner. Due regard was had to the physical condition, which of necessity affects the

mind and morals; due regard was given to the proper education of the child in an effort to make the child a useful member of society and train an immature mind into a mature mind. Where trouble occurred in one place of education, an effort was made to impart that education from some other source and in institutions that had a proper background and experience in the education of children. The foster parents were apparently of such financial means as enabled them to give such education, and to give pleasures, possibly too generously. The child was placed in both private and public schools, was sent to a camp, was placed in a correctional institution, and apparently to no beneficial purpose. There was evidently something wrong in the child's make-up, for he early developed a tendency to steal, and seemed to have no regard or no comprehension of the right of property. That, of itself, is perhaps not strange in small children, but the continued habit is abnormal.

The foster parents changed their places of residence in order to see if a change of view or a change of companionship would be of assistance, but there was seemingly no lessening of the tendency to take property that belonged to others.

The record in school in so far as simple book learning is concerned, is creditable, and indicates a mind normal so far as learning is concerned.

The foster parents have shown an effort to give religious instruction and to talk personally with the child, and, while it is possible that one, in looking back, might say that the " rod was spared " and that better results would have been obtained by more punishment and less persuasion, still that of itself is no reason why this application should be denied.

This condition of affairs continued up to within the last year and finally resulted in the placing of the child, under the order of the Children's Court of Westchester county, in the Children's Village, so called. In June of last year the petitioner obtained a temporary release of the child and took him to his home. The boy was then sixteen years of age and the petitioner took up the matter personally with the boy, again pointing out his errors, offered to let bygones be bygones, and suggested that the boy go to work with the backing of himself. Apparently such an arrangement was made. The next day the boy disappeared, taking the foster parents' automobile, and, since that time, nothing has been heard of the boy. Efforts have been made to locate him, but to no avail, and his whereabouts still remain unknown.

He has, therefore, willfully deserted such foster parents and the evidence satisfactorily shows, not only such desertion, but a continued course of committing misdemeanors and ill-behavior such

as justify this court in abrogating the adoption. This conclusion is not reached hastily and without careful thought and only with reluctance.

There is a difference between *dependent* children and defective children. The present case had to do in its inception with a dependent child, which is the term applied to normal children who must be supported by others than their natural guardians. Dependent children are released from the initial responsibility of life — parents. For many years prior to 1884 the practice obtained of receiving young children into institutions, to save their lives, develop religious beliefs, and to find better places for the children. The plan to rear dependent children in family homes existed in two forms — *first*, the child being boarded out in families, and *second*, placing out of children, or having the children indentured or " bound out " to persons willing to receive them and to maintain and educate them. This plan found its chief field in the United States. Children were also apprenticed in families or were consigned to the almshouse. It was recognized that the influence of the almshouse was degrading, and an organized movement for " placing children " in families and homes started with the founding of the New York Children's Aid Society in 1853. Through these influences, it has become a historical fact that many thousands of children from New York city were " placed out " in homes in the west. This was known as the " placing out " system. This system only gave to the children a home and home environment. It created no rights. The general public's interest in the subject led to the active participation of the State, resulting in the enactment of chapter 438 of the Laws of 1884 dealing with the whole matter. It provided for adoption of dependent children, and the creation of reciprocal property rights by a contract entered into between the adopting parent and the institution having control of the dependent child, with the approval of the Surrogate's Court.

" From the viewpoint of the community, adoption taking, as it does in the majority of cases, a child from a home of poverty, a charitable institution or perhaps even the streets, and placing that child in an environment tending toward his physical, mental and moral uplift and betterment is surely a factor, and no mean one, for good in the welfare of the State." (Address of John Francis Brosnan, M. A., J. D., before Society of Medical Jurisprudence, February 12, 1917.)

The learned special guardian clearly pointed out in his illuminating report the distinction between the cases of voluntary adoptions and the adoptions of children from charitable institutions, and the reason therefor, as well as the reasons for the distinction made in their

abrogation. The history back of the subject indicates the reason why a distinction is made in sections 117 and 118 of the Domestic Relations Law, which relate to the abrogation of different kinds of adoption. In the abrogation of the voluntary adoption consents are required. As to cases of adoption of dependent children, application on behalf of a child is based on the cruelty, misuse, refusal of necessary provisions or clothing, or inability to support, maintain or educate such child, or of any violation of duty on the part of the foster parent toward such child. The section is predicated upon the general welfare of the child. Consents are not necessary. Section 118, which relates to abrogation upon application by the foster parent, is based on the " wilful desertion of such child from such foster parent, or of any misdemeanor or ill behavior of such child." Under this section the court is charged to have " due regard to the interests of *both*," meaning, of course, the child and the petitioner, the foster parent. Again, consents are not necessary. It becomes the duty of the court to protect both the child and the adopting parent. This is of significance, for in no other case can abrogation of adoption be predicated solely upon the acts of the child.

When a child reaches the age of sixteen, all that a natural or foster parent can do is to give him the opportunity of further education and a preparation for his life's work, and, if such child refuses to take advantage of that opportunity, he has brought the punishment upon his own head. In the case of an absolute desertion of the child from his foster parents, it might well have occurred in anger or in temporary passion, but where that child declines for months to let his foster parents know where he is, it seems that the foster parents should be relieved of their burden and that the child should be deprived of any material advantages that might result by the continuation of the relation of parent and child.

In the instant case the tendencies of the child were evident to the foster parents before the formal adoption, but the proclivities of a child of four years certainly would not justify the abrogation; it is the continuation of such habits that justify the abrogation.

In the instant case I hold that the child has violated his duty toward the foster parent and that due regard to the interest of both require that such adoption be abrogated. The learned special guardian, appearing for the child, agrees with the court's opinion.

Until the wayward boy is apprehended, it is idle for this court to make any disposition of him.

Let an order be made and entered accordingly.